IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHEYANNE M. CASAS, | ) |
|       Plaintiff, | ) ) )   No. 04 C 5296 |
| v. | ) )   Judge Ronald A. Guzmán |
| ALBERTO GONZALES, ATTORNEY GENERAL, DEPARTMENT OF JUSTICE,[1] | ) ) ) ) |
|       Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Cheyanne M. Casas has sued the U.S. Attorney General pursuant to 42 U.S.C. § 2000e ("Title VII") for gender discrimination, sexual harassment, and retaliation. The case is before the Court on defendant's Federal Rule of Civil Procedure ("Rule") 56 motion for summary judgment. For the reasons set forth below, the motion is granted.

## Facts

In June 2002, plaintiff was hired by the Federal Bureau of Prisons ("BOP") as a staff physician in the health services department at the Metropolitan Correctional Center in Chicago ("MCC"). (Pl.'s LR56.1(b)(3)(B) Stmt. ¶ 1.) Plaintiff's immediate supervisor was the Clinical Director, Dr. Abdula Kareem. (*Id.* ¶ 11.) Kareem reported to Associate Warden Darlene Alexander, who, along with Clarence Cranford, Health Services Administrator ("HSA"),

---

[1] When this case was filed, John Ashcroft was the U.S. Attorney General. He has since been replaced by Alberto Gonzales, and the Court has amended the caption to reflect the change.

administered the health services department during the relevant portion of plaintiff's tenure at the MCC. (*Id.* ¶¶ 6, 9, 16.) Alexander had ultimate responsibility for the department, but the HSA authorized expenditures and scheduled the non-physician medical staff. (*Id.*) Cranford and Alexander both reported to MCC Warden Jerry Graber. (*Id.* ¶ 17.)

When fully staffed, the health services department had two physicians, six physician assistants ("PAs"), one nurse, one dentist, one pharmacist, and one medical records technician. (*Id.* ¶ 2.) However, the department was rarely, if ever, fully staffed. (*Id.* ¶ 20.) During the time that plaintiff worked there, two of the PAs retired and were not replaced, the nurse was on maternity leave, and the pharmacist frequently failed to show up for work. (*Id.* ¶ 21.) As a result, plaintiff often worked without a medical records technician, nurse or PA. (*Id.* ¶ 22.)

Lack of staff was not the only personnel problem at the department. There was also a power struggle between the doctors and PAs, who were BOP employees, and the HSA, nurse, dentist, pharmacist and medical records technician, who were employees of Public Health Services ("PHS"). (*Id.* ¶¶ 4, 27.) According to plaintiff, the PHS employees lied, eavesdropped and generally behaved so unprofessionally that it made the atmosphere in the health department "venomous" and "like a war-zone." (*Id.* ¶¶ 28-29.)

Collectively, the staff of the health services department was responsible for providing medical care to MCC inmates twenty-four hours a day, seven days a week. (*Id.* ¶ 3.) As Clinical Director, Kareem was responsible for all of the medical care the department provided. (*Id.* ¶ 12.) In addition to seeing patients, however, Kareem had a variety of other duties including: supervising plaintiff and the PAs, preparing evaluations for the medical personnel, supervising outside consulting medical specialists, attending department head meetings, testifying in court

about inmates' medical conditions, providing medical training outside the office, and requesting medical equipment. (*Id.* ¶ 13.)

Though the parties dispute whether his absences were legitimate, there is no dispute that Kareem was often absent from the clinic floor. (Def.'s Reply Pl.'s LR56.1(b)(3)(C) Stmt. ¶¶ 22-25, 27, 30.) Because of Kareem's absences, plaintiff says, she was responsible for providing most of the medical care to the inmates. (Pl.'s LR56.1(b)(3)(C) Stmt. ¶¶ 63-64.)

In late 2002 and early 2003, plaintiff complained to Cranford and Alexander about Kareem's absences and her heavy workload. (Def.'s Reply Pl.'s LR56.1(b)(3)(C) Stmt. ¶¶ 38, 46-47.) Both pledged to speak to Kareem about plaintiff's concerns, but plaintiff saw no improvement in the situation. (*Id.* ¶¶ 39, 48.)

Although plaintiff resented his absences, she had no problems interacting with Kareem from the time they started working together in the fall of 2002 until February 27, 2003. (Def.'s Ex. 2, Casas Dep. at 129-30.) On that day, however, things changed. Kareem ordered plaintiff to get an inmate's medical file, a purely clerical task, and then admonished her about the care she had provided to him. (Pl.'s LR56.1(b)(3)(B) Stmt. ¶ 43.) Kareem yelled at Casas, criticized her work and called her insubordinate, causing her to cry. (*Id.* ¶¶ 43, 45, 47.)

The next day, Warden Graber had a meeting with plaintiff, Kareem, Cranford and Alexander. (*Id.* ¶ 49.) During the meeting, Kareem refused to apologize to plaintiff and yelled at her again. (*Id.* ¶ 50.) When the Warden directed Kareem to apologize, Kareem approached plaintiff, lifted her out of her chair, hugged her, rubbed her back, and said something to the effect of, "She just wants to be treated like a baby. There, there, baby, it's ok." (*Id.* ¶ 52.) Plaintiff, who says she had difficulty breaking away from Kareem, became upset and began crying. (*Id.* ¶¶ 53-54.)

3

Immediately thereafter, Warden Graber reprimanded Kareem and told him never to touch plaintiff again. (*Id.* ¶ 55.) Alexander also reprimanded Kareem both verbally and in writing, counseled him several times regarding his behavior, and ordered him to take sensitivity training. (*Id.* ¶¶ 57-59.) Further, Alexander removed Kareem's supervisory authority over plaintiff for administrative matters like leave requests. (Pl.'s LR56.1(b)(3)(C) Stmt. ¶¶ 313, 315.) In addition, plaintiff was moved to a new office so she would no longer have to share office space with Kareem. (Pl.'s LR56.1(b)(3)(B) Stmt. ¶ 81.)

Warden Graber took no further disciplinary action against Kareem because he believed the verbal reprimands and counseling were sufficient to prevent him from repeating the behavior. (*Id.* ¶ 67.) Moreover, based on input from MCC Human Resources Manager, Cassandra Loggins-Mitchell, and Alexander, Graber concluded that the incident did not constitute sexual harassment. (*Id.* ¶¶ 60, 65.) Consequently, the Warden did not to refer the incident to BOP's Office of Internal Affairs ("OIA"). (*Id.* ¶ 65.)

After the incident on February 28, plaintiff became physically ill, was unable to stop crying and could not return to work. (Pl.'s LR56.1(b)(3)(C) Stmt. ¶¶ 172-73, 178-80.) Alexander referred plaintiff to John Pindelski, a psychologist employed by the BOP, for counseling. (*Id.* ¶¶ 185-86.) Pindelski concluded that plaintiff had post-traumatic stress disorder. (*Id.* ¶¶ 187-95.)

At Cranford's invitation, plaintiff took a few days of leave. (*Id.* ¶ 337.) But, while she was off, Cranford pressured her to return. (*Id.* ¶ 338.) When plaintiff returned to work, she discovered that her absences had been recorded as compensatory, rather than sick, time. (Pl.'s LR56.1(b)(3)(B) Stmt. ¶ 110.) After Casas complained to Alexander and Cranford, the mistake was corrected. (*Id.* ¶¶ 112-13.)

4

When plaintiff returned to work after the February 28 incident, her workload problems intensified. (Pl.'s LR56.1(b)(3)(C) Stmt. ¶ 270.) Kareem pushed more work on plaintiff and monopolized the PAs' time. (*Id.* ¶¶ 271-72, 281.) Plaintiff complained to Cranford and Alexander about the situation, but they did nothing to change it. (*Id.* ¶¶ 276-92.)

Though they no longer shared an office, plaintiff and Kareem continued to work the same shift. (*Id.* ¶ 314.) Moreover, because he was the only one qualified to do so, Kareem continued to supervise plaintiff's clinical work and evaluate her recommendations that inmates be referred for outside medical care. (*Id.* ¶¶ 311, 313; Pl.'s LR56.1(b)(3)(B) Stmt. ¶ 87.) Though Kareem had rarely overruled plaintiff's referral recommendations before the February 28 incident, after it, she says, he did so repeatedly. (Pl.'s LR56.1(b)(3)(C) Stmt. ¶¶ 328-35.)

At the end of March 2003, plaintiff decided to quit her job. (Pl.'s LR56.1(b)(3)(B) Stmt. ¶ 128.) Her last day at the MCC was April 28, 2003. (*Id.*)

Shortly before she left, plaintiff asked Warden Graber to waive her obligation to repay the grant she had received through the Physician Comparability Allowance Plan ("PCAP"). (*Id.* ¶ 122.) The PCAP is a program in which doctors who agree to work for the BOP for a specified period of time are paid additional salary. (*Id.* ¶ 119.) If, however, a PCAP participant terminates her employment before the term expires, she must repay the additional salary to BOP. (*Id.* ¶ 120.) The BOP's Medical Director is authorized to waive PCP repayment, but only if circumstances beyond the physician's control caused her to quit. (*Id.* ¶ 121.)

On April 15, 2003, Warden Graber recommended to the BOP Medical Director that plaintiff's waiver request be denied because he did not believe the circumstances of her departure were beyond her control. (*Id.* ¶ 123; Pl.'s LR56.1(b)(3)(C) Stmt. ¶ 395.) The Medical Director

accepted Graber's recommendation and denied plaintiff's request. (Pl.'s LR56.1(b)(3)(B) Stmt. ¶ 124.)

## Discussion

To prevail on a summary judgment motion, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). At this stage, we do not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

## Gender Discrimination

In Count I, plaintiff asserts two claims for gender discrimination under Title VII, both of which are grounded solely in her workload. (*See* Compl. ¶¶ Count I ¶¶ 47-50.) In the first, plaintiff claims that Kareem overloaded her with work because of her gender. In the second, she claims his supervisor did nothing to rectify the situation for the same reason. Plaintiff can defeat defendant's motion on these claims either by presenting direct or circumstantial evidence of discriminatory intent, the so-called direct method of proof, or by employing the indirect, burden-shifting method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Dandy v.*

*United Parcel Serv., Inc.*, 388 F.3d 263, 272 (7th Cir. 2004). We will evaluate the evidence on both claims under both standards.

To constitute so-called direct evidence of discrimination, evidence must not only "speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question." *Ransom v. CSC Consulting, Inc.*, 217 F.3d 467, 468 (7th Cir. 2000) (quotations omitted). The only evidence in the record that arguably meets that standard with respect to the first claim is the statement of Nurse Melanie Smith that Kareem "would always assign more work to the two female PA's [sic] instead of the male PA's [sic]." (Pl.'s Ex. 13, Smith Aff. at 105.)

Smith's statement, however, is inadmissible. *See Stinnett v. Iron Works Gym/Executive Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002) (stating that court may only consider evidence that is admissible in content when deciding a summary judgment motion). Nurse Smith can opine about the PAs' assignments during plaintiff's tenure only if she has personal knowledge of them. *See* FED. R. EVID. 602. The record does not support the inference that she did. On the contrary, it is undisputed that Kareem supervised the PAs, that Smith did not "follow [Kareem] around" or "sit around and wait for him" to see patients, and that she was on maternity leave during part of plaintiff's employment. (*See* Def.'s Reply Pl.'s LR56.1(b)(3)(C) ¶ 11; Pl.'s Ex. 1, Casas Dep. at 54; Pl.'s Ex. 13, Smith Aff. at 98, 100.) Because Smith does not say that she has personal knowledge of the assignments Kareem gave to the PAs, and we cannot infer that she does, her statement about them is inadmissible.

There is other evidence in the record that suggests Kareem was rude to or dismissive of women on his staff, including: (1) the statement of PA Hung Tran, who is male, that Kareem spoke more aggressively to female staff members than male staff members (Pl.'s Ex. 15, Tran

7

Aff. at 5); (2) the statements of Health Service Specialist Denise Federighi and Nurse Smith that Kareem would not pay attention to the questions of female staff members (Pl.'s Ex. 12, Federighi Aff. at 82; Pl.'s Ex. 13, Smith Aff. at 99-100); and (3) Cranford's statement that Smith and two female PAs had complained to him that Kareem was abusive (Pl.'s LR56.1(b)(3)(C) Stmt. ¶ 90).

These statements support the notion that Kareem harbored some gender bias. And they would have some probative value, if plaintiff claimed that Kareem was abusive to her, refused to discuss medical issues with her or assigned her clerical tasks in lieu of patient care. But she does not.[2] Her first claim is based solely on her belief that Kareem sloughed his medical duties off onto her because of her gender. The fact that Kareem was rude to the female staffers does not, however, support the inference that he deluged plaintiff with work because she is a woman. On the contrary, the fact that Kareem trusted plaintiff to perform the majority of the patient care, suggests that he viewed her as skilled and capable, not incompetent or inferior. Because there is no evidence that suggests Kareem's purported bias had some connection to the amount of work plaintiff had to perform, his alleged treatment of other staffers is not direct evidence of discrimination.

The only direct evidence as to plaintiff's second claim, that Kareem's supervisor ignored her plight, is Cranford's alleged statement to Kareem that plaintiff worked long hours because "her old man is a resident in Loyola, is working long hours and there is nobody at home, that's why she try [sic] to stay until her husband comes home." (Pl.'s Ex. 11, Kareem Dep. at 15.)

---

[2]Indeed, there is no evidence that Kareem yelled at, condescended to, belittled, ignored or otherwise impugned plaintiff's abilities or temperament at any time before February 27, 2003. (*See* Def.'s Ex. 11, Casas Aff. at 34 (plaintiff stating to an EEO investigator that "there had been *no . . . time* [prior to February 27, 2003] when Dr. Kareem talked to me like that" (emphasis added)).)

Though Cranford co-administered the health department with Alexander, it is undisputed that Kareem's supervisor, the only person who could direct and discipline him, was Alexander. (Pl.'s LR56.1(b)(3)(B) Stmt. ¶ 16; Def.'s Ex. 5, Alexander Dep. at 55.) Absent evidence that suggests Alexander shared Cranford's view, his statement is not direct evidence that Kareem's supervisor ignored plaintiff's workload complaints because of her gender.

Plaintiff can still defeat defendant's motion on these claims, however, by using the *McDonnell-Douglas* indirect method of proof. To do so, she must first establish a *prima facie* case of discrimination by providing some evidence that: (1) she is a member of a protected class; (2) she was meeting defendant's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) defendant treated her less favorably than a similarly-situated male. *Vakharia v. Swedish Covenant Hosp.,* 190 F.3d 799, 806 (7th Cir. 1999). If she succeeds in doing so, the burden shifts to defendant to offer a legitimate, nondiscriminatory reason for its action. *Id.* at 806. If defendant does so, the burden shifts back to plaintiff to present evidence that the proffered reason is pretextual. *Id.* at 807.

There is no dispute that plaintiff satisfies the first and second elements for both claims. But defendant says she cannot satisfy the third because additional work does not constitute an adverse employment action.

The adverse action element is problematic. Certainly, a work increase of the magnitude plaintiff alleges, two to three hours a day, can be an adverse action under certain circumstances. *See Minor v. Centocor, Inc.*, 457 F.3d 632, 634 (7th Cir. 2006) (holding that requiring plaintiff to work twenty-five percent longer to earn the same income, which was "functionally the same as a 20% reduction in . . . hourly pay," was a material adverse change in the terms of her employment). But plaintiff admits that she was never told to – in fact, was told not to – put in

9

the extra hours, and it appears that she received compensatory time for doing so. (Def.'s Ex., 2, Casas Dep. at 63-65.) Thus, the extra hours look like voluntary, paid overtime, not an adverse job action.

Even if the extra work does constitute an adverse action, an issue we do not decide, plaintiff would still not prevail because she cannot satisfy the last element of the *prima facie* case. The similarly-situated man to whom plaintiff compares herself is Kareem. But it is undisputed that Kareem was her supervisor, a fact that, by itself, precludes him from being situated similarly to her. (Pl.'s LR56.1(b)(3)(B) Stmt. ¶¶ 11, 13); *see Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1042 (7th Cir. 1993) (stating that manager was not similarly situated to subordinate employee); *Rodriguez v. Motorola, Inc.*, No. 00 C 3133, 2001 WL 968651, at *6 (N.D. Ill. Aug. 22, 2001) ("[S]upervisors and superiors are not similarly situated to subordinates.").

Their disparate positions in the health department hierarchy is not, however, the only relevant difference between Kareem and plaintiff. It is also undisputed that, as staff physician, plaintiff was primarily responsible for patient care, while patient care was just one of Kareem's various duties. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 10-13.) Plaintiff has offered no evidence to suggest that, despite the difference in their job titles and duties, her patient load should have been equal to Kareem's or Kareem should not have delegated any of his tasks to her. Absent such evidence, plaintiff has not demonstrated that either Kareem or Alexander treated a similarly situated male more favorably, which precludes her from making a *prima facie* case of gender discrimination on either claim.

**Sexual Harassment**

In Count II, plaintiff alleges that Kareem subjected her to hostile work environment sexual harassment. As plaintiff said in her EEO complaint, her complaint in this suit, her response to defendant's statement of material facts, and her brief in opposition to defendant's summary judgment motion, this claim is based solely on the events of February 27, and 28, 2003. (*See* Def.'s Ex. 8, 4/13/03 EEO Compl. at 2; Compl. ¶¶ 47-53; Pl.'s LR56.1(b)(3)(B) Stmt. ¶¶ 42, 46; Pl.'s Mem. Law Resp. Def.'s Mot. Summ. J. at 13.) Accordingly, the Court will limit its analysis of the claim to those events.

To make a *prima facie* case of hostile work environment sexual harassment, plaintiff must show that: (1) she was subjected to unwelcome sexual advances, requests for sexual favors or other conduct of a sexual nature; (2) the harassment was based on sex; (3) the harassment unreasonably interfered with her work performance or created an intimidating, hostile or offensive working environment; and (4) there is a basis for employer liability. *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1996). Defendant says the record contains no evidence to support the second element, that Kareem's conduct was motivated by plaintiff's gender.

The Court disagrees. Kareem's behavior on February 28, infantilising plaintiff and forcibly "comforting" her, suggests that Kareem viewed her as overly emotional or weak, unflattering characteristics stereotypically attributed to women. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989) (stating that decisionmakers' stereotyped remarks can be evidence of gender bias); *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 773 (4th Cir. 1997) (noting that the statement "We've made every female in this office cry like a baby," is "logically attributable" to plaintiff's gender); *Lindahl v. Air France*, 930 F.2d 1434, 1439 (9th Cir. 1991)

(reversing summary judgment for defendant in part because evidence that the decisionmaker viewed female job candidates as "nervous and emotional" could suggest that the decision was based on "stereotypical images . . . , specifically that women do not make good leaders because they are too 'emotional'" ). Though the evidence is far from overwhelming, it is sufficient to support the inference that Kareem acted as he did because of plaintiff's gender.

Even if plaintiff has satisfied the second element, defendant says that support for the third, that the harassment created a hostile work environment, is lacking. To satisfy the third element, plaintiff must offer facts that suggest the harassment created an environment that was both objectively and subjectively hostile. *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 677 (7th Cir. 2005). There is no dispute that plaintiff perceived her workplace to be hostile. But defendant says the undisputed evidence establishes that her workplace was not objectively harassing.

The Court agrees. An objectively hostile work environment is one that a reasonable person would find hostile or abusive. *Adusumilli v. City of Chi.*, 164 F.3d 353, 361 (7th Cir. 1998). "In evaluating the objective offensiveness of a . . . work environment, we consider all of the circumstances, including frequency and severity of the conduct, whether it is humiliating or physically threatening, and whether it unreasonably interferes with [the] employee's work performance." *Racicot*, 414 F.3d at 677-78. "The workplace that is actionable is the one that is hellish." *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997) (quotation omitted).

Plaintiff says Kareem harassed her on February 27, 2003 by: (1) telling her to get a patient's chart, the task of a technician not a doctor; (2) telling her not to question his instructions; (3) yelling at her about her treatment of an inmate; and, when she rebuked him and stood up to leave; (4) ordering her to sit down. (Pl.'s LR56.1(b)(3)(C) Stmt. ¶¶ 92-95; Def.'s Ex.

8, 4/13/03 EEO Compl. at 9.) Plaintiff says the harassment continued on February 28, 2003, when Kareem refused her request for an apology, yelled at her, forcibly hugged her, rubbed her back, and said something like, "she just wants to be treated like a baby. There, there, baby, it's ok." (Pl.'s LR56.1(b)(3)(B) Stmt. ¶¶ 50, 52.)

Certainly, Kareem's telling plaintiff to perform a clerical task and harshly upbraiding her for her treatment of an inmate was unprofessional, and his behavior on February 28 was inappropriate and insulting. But two episodes of unprofessional behavior, one unwanted hug and a few insulting comments over a two-day period do not add up to an objectively harassing environment. *Compare Gentry v. Export Packaging Co.*, 238 F.3d 842, 845, 851 (7th Cir. 2001) (evidence that during a four-month period, a thirty-year-old manager subjected the nineteen-year old plaintiff to "40 hugs, 15 shoulder rubs, a kiss on her cheek," asked her to "'try out the back counter" and stay the night with him, told her that "her clothes would look better on the floor" and gave her a page of the "'World of Love 1997, Mexico' calendar that depicted cartoon drawings of different sexual positions one for each day, and . . . asked her to pick out a couple of her favorite days" held sufficient to support harassment verdict for plaintiff) *and Poulos v. Vill. of Lindenhurst*, No. 00 C 5603, 2002 WL 31001876, at *8 (N.D. Ill. Sept. 3, 2002) (record supported inference that work environment was objectively hostile because it showed that "the male officers . . . continually made disparaging comments about women in general and plaintiff in particular, used offensive or obscene language when they communicated with and to describe her, made sexually explicit comments and jokes and that they did so on an almost continual basis") *with Adusumilli*, 164 F.3d at 361-62 (holding that co-workers' "teasing . . . , ambiguous comments about bananas, rubber bands, and low-neck tops, staring [at plaintiff's breasts] and attempts to make eye contact [with her], and four isolated incidents in which . . . [plaintiff's] arm,

13

fingers, or buttocks" were "briefly touched" was not actionable harassment) *and Weiss v. Coca-Cola Bottling Co. of Chi.*, 990 F.2d 333, 337 (7th Cir. 1993) (evidence that supervisor asked plaintiff "for dates, called her a 'dumb blond,' put his hand on her shoulder several times, placed 'I love you' signs in her work area and attempted to kiss her" held "not [to] "meet the standard for actionable sexual harassment"). Because plaintiff has not satisfied the third element of her *prima facie* case, defendant is entitled to judgment as a matter of law on Count II.

**<u>Retaliation</u>**

In Count III, plaintiff alleges that defendant took a variety of retaliatory actions against her after she filed her EEO complaint. Once again, plaintiff can defeat defendant's motion on this claim, by using either the direct or the indirect method of proof. *Stone v. City of Ind. Pub. Utils. Div.*, 281 F.3d 640, 643-44 (7th Cir. 2002). The direct method requires plaintiff to offer some proof that but for her protected conduct, she would not have suffered an adverse job action. *Id.* at 643. The indirect method requires plaintiff "to show that after filing the charge only [s]he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though [s]he was performing [her] job in a satisfactory manner." *Id.* at 644.

The allegedly retaliatory acts that plaintiff identifies are: (1) Kareem's overloading her with work and Alexander's continued refusal to balance the two doctors' workloads; (2) Alexander's refusal to separate her from Kareem; (3) Cranford's pressuring her to return to work after the February 28, 2003 incident; (4) Cranford's decision to charge her absences after the February 28 incident to annual rather than sick leave; (5) Cranford's refusal to assign PAs to her shift; (6) Kareem's rejection of her recommendations that certain inmates be referred out for

medical treatment; (7) the failure of Graber and Alexander to discipline Kareem for the February 28 incident; (8) Graber's failure to refer Casas' complaint to OIA; (9) her constructive discharge; and (10) Graber's refusal to waive repayment of her PCAP grant.

To defeat defendant's motion under either method, plaintiff must offer evidence that suggests these acts constituted adverse job actions. *Stone*, 281 F.3d at 643-44. Though the term is interpreted broadly in this circuit, "not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). An adverse job action includes only those actions that cause "a *materially adverse* change in the terms or conditions of . . . employment." *Spring v. Sheboygan Sch. Dist.*, 865 F.2d 883, 885 (7th Cir. 1989). "A materially adverse change might be indicated by a termination in employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993); *see Smart*, 89 F.3d at 442 (holding that "[negative] evaluations alone do not constitute an actionable adverse employment action"); *Crady*, 993 F.2d at 135-36 (holding that lateral transfer to job with same salary, benefits and level of responsibility was not an adverse employment action); *Spring*, 865 F.2d at 886 (holding that reassignment of school principal, which did not negatively impact responsibilities or salary, was not adverse employment action under ADEA).

Many of the acts plaintiff characterizes as retaliatory are not adverse job actions. Alexander's continued refusal to equalize the doctors' workloads was not an adverse action because, as discussed above, it is undisputed that having a patient load equal to Kareem's was not a term of plaintiff's employment. The alleged pressure plaintiff received from Cranford to return to work after February 28, 2003 was also not an adverse action because there is no evidence that

15

it prompted her to cut her leave short or otherwise negatively impacted any of her employment terms. The same is true for defendant's accounting treatment of plaintiff's post-February 28 absences. It is undisputed that those absences were initially charged to plaintiff's compensatory time. It is also undisputed, however, that they were reclassified as sick days before plaintiff left the MCC, (Pl.'s LR56.1(b)(3)(B) Stmt. ¶ 113; Pl.'s Ex. 1, Casas Dep. at 171-72), and there is no evidence that the error adversely affected plaintiff before it was corrected. Similarly, Kareem's rejection of plaintiff's recommendations for outside treatment is not an adverse job action. Plaintiff admits that she had been required to get Kareem's approval for such referrals before February 27, 2003 and that he had overruled some of her recommendations before that date. (Pl.'s Ex. 1, Casas Dep. at 148, 156.) Moreover, she offers no facts to suggest that such rejections, either pre- or post-February 2003, were the equivalent of or led to discipline, impacted her pay or benefits or otherwise changed the terms of her employment.

That brings us to defendant's alleged refusal to discipline Kareem. In theory, an employer's turning a blind eye to misconduct could be an adverse action. But there is no evidence that defendant did so here. On the contrary, plaintiff admits that Kareem was reprimanded verbally by Warden Graber, reprimanded verbally and in writing by Alexander, counseled by Alexander, and directed to take a sensitivity course, which he completed. (Pl.'s LR56.1(b)(3)(B) Stmt. ¶¶ 57-59.)

Perhaps plaintiff believes that Kareem should have been disciplined more harshly. But defendant's failure to do so, and its failure to refer the incident to OIA, another allegedly retaliatory action, adversely impacted plaintiff only if Kareem's misconduct continued. The record establishes that it did not. Plaintiff offers no evidence that suggests Kareem hugged, touched, yelled at, belittled or infantilised her at anytime after February 28, 2003. Absent such

evidence, defendant's failure to mete out greater punishment to Kareem or report his conduct to OIA do not constitute adverse employment actions.

Plaintiff also lacks proof that defendant refused to separate her from Kareem. Casas admits that management moved her out of the office she shared with Kareem and removed him as her supervisor for administrative matters, like timekeeping and leave requests, immediately after the February 28 incident. (Pl.'s LR56.1(b)(3)(B) Stmt. ¶ 81; Def.'s Ex. 2, Casas Dep. at 141-42.) She also admits that Alexander said she would schedule Kareem on a different shift at plaintiff's request, but she never asked Alexander to do so. (Pl.'s LR56.1(b)(3)(B) Stmt. ¶ 90; Def.'s Ex. 2, Casas Dep. at 164-67.) Plaintiff further admits that defendant could not remove Kareem as plaintiff's supervisor for clinical matters because BOP policy required that clinical work be supervised by the Clinical Director and neither Cranford nor Alexander had the necessary experience to do it. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 87.) Finally, plaintiff admits that Alexander and Loggins-Mitchell had several meetings with her to explore ways to improve her work environment, but plaintiff had no concrete suggestions for change. (*Id.* ¶ 89.) In short, the record simply does not support plaintiff's claim that defendant failed to take steps to separate her from Kareem.

Next, plaintiff says Cranford retaliated against her by failing to assign PAs to her shift. Viewed favorably to plaintiff, the record supports the proposition that Cranford did not schedule PAs to work on her shift. But it does not support the proposition that plaintiff's EEO complaint prompted him to do so. It is undisputed that plaintiff contacted an EEO counselor on March 11, 2003 and filed a formal complaint on April 13, 2003. (*See* Def.'s Ex. 8, EEO Compl. at 1.) The record does not show, however, when Cranford learned about her complaint. Without such

evidence, we cannot infer that Cranford would have scheduled the PAs differently but for plaintiff's complaint, the direct method of proving retaliation. *See Stone*, 281 F.3d at 643.

Plaintiff fares no better with the indirect method. That method requires plaintiff to show that after she filed her complaint, she and not any other similarly situated employee who did not complain, was deprived of the PAs' services. *Id.* at 644. As discussed above, Kareem, the employee to whom plaintiff compares herself, is not situated similarly to her.

Moreover, even if he were, the record does not support the inference that the PAs' schedule impacted only plaintiff. It is undisputed that Kareem and Casas worked the same shift in March and April 2003. (Def.'s Reply Pl.'s LR56.1(b)(3)(C) Stmt. ¶¶ 282, 285.) If, as plaintiff alleges, Cranford stopped scheduling the PAs to work that shift, then he deprived both plaintiff and Kareem of their services. Because plaintiff has not shown that the burden of working without PAs was foisted solely upon her, her retaliatory scheduling claim would fail even if Kareem were comparable to her.

Plaintiff also says that defendant retaliated against her by making conditions so onerous that she was forced to quit. Constructive discharge can be an adverse employment action, but the evidence does not suggest that such a discharge occurred here. Plaintiff was constructively discharged, if her "working conditions were so intolerable as a result of unlawful discrimination that a reasonable person would be forced into involuntary resignation." *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000). Working conditions are intolerable only if they are "even more egregious than [those that meet] the high standard for [a] hostile work environment [claim]." *Id.*

Plaintiff's working conditions after she filed her EEO complaint, continuing to perform most of the patient care and having to interact with Kareem on a clinical level, do not even

approach the kind of conditions required to demonstrate a constructive discharge. *See, e.g., Taylor v. W. & So. Life Ins. Co.*, 966 F.2d 1188, 1190-99 (7th Cir. 1992) (evidence that over a four-year period African-American plaintiff's white supervisors subjected him to racist jokes, photographed plaintiff while holding a gun to his head and then passed the pictures around at the office saying, "This is what a n***** looks like with a gun to his head," fondled plaintiff's wife, selectively enforced rules and policies against him, convinced him to transfer to an ailing office with an all black staff on the pretext that it was a good career move, subsequently denied him transfers because he was a black man and/or he was married to a white woman, and ultimately told him that he could not advance in the company because of his race and that of his wife established constructive discharge); *Brooms v. Regal Tube Co.*, 881 F.2d 412, 416 n.1, 416-17, 423 (7th Cir. 1989) (holding that African-American woman was constructively discharged because, during her sixteen-month employment, her supervisor repeatedly used "racial slurs or a combination of racial slurs and sexual innuendo in the office or at business-related social functions," repeatedly propositioned her, showed her a pornographic photo "depicting an interracial act of sodomy[,] told her that the photograph showed the 'talent' of a black woman [and] . . . stated that she was hired for the purpose [depicted]," and showed her several photocopies of a racist pornographic picture involving bestiality" and, when she attempted to grab one of them, "grabbed her arm and threatened to kill her"), *overruled in part on other grounds, Saxton v. Am. Tel & Tel. Co.*, 10 F.3d 526 (7th Cir. 1993). Because a reasonable person would not have viewed plaintiff's working conditions as intolerable, she was not constructively discharged.

The last alleged act of retaliation that plaintiff identifies is defendant's refusal to waive repayment of her PCAP grant. Even if this post-resignation event constitutes an adverse

19

employment action, an issue we do not decide, plaintiff has no evidence that suggests the waiver decision was retaliatory. The only direct evidence in the record is the fact that her waiver was denied about a month after she first contacted the EEO counselor and a few days after she filed the formal complaint. Without more, however, the timing of events does not support an inference of retaliation. *See Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) (stating that "[s]peculation based on suspicious timing alone, however, does not support a reasonable inference of retaliation").

Plaintiff has no more success with the indirect method. To make a *prima facie* case, plaintiff must offer some evidence that a similarly situated employee who did not file a charge was given a PCAP waiver. *See Stone*, 281 F.3d at 644. Plaintiff has not done so, which dooms this claim.

### Conclusion

For the reasons set forth above, defendant's motion for summary judgment [doc. no. 19] is granted and this case is terminated.

**SO ORDERED.**   **ENTERED: 9/28/06**

_____

**HON. RONALD A. GUZMAN**
**United States District Judge**